# DECISIONS

OF THE

## SUPREME JUDICIAL COURT

OF

## MASSACHUSETTS

---

COMMONWEALTH *VS.* HERMANY GONSALVES.

Suffolk. February 7, 2005. - August 29, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Confrontation of witnesses. *Witness,* Unavailability. *Evidence,* Unavailable witness, Testimonial statement. *Practice, Criminal,* Confrontation of witnesses.

Discussion of *Crawford* v. *Washington,* 541 U.S. 36 (2004), in which the United States Supreme Court held that the confrontation clause of the Sixth Amendment to the United States Constitution imposed a complete bar to the admission in evidence at a criminal trial of out-of-court incriminating statements that are determined to be testimonial unless the declarant is available at trial or the declarant formally is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. [5-7] SOSMAN, J., concurring in part.

This court concluded that, under the confrontation clause of the Sixth Amendment to the United States Constitution, which imposes a complete bar to the admission in evidence at a criminal trial of testimonial out-of-court

incriminating statements unless the declarant is available at trial or the declarant is formally unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant, questioning by law enforcement agents, whether police, prosecutors, or others acting directly on their behalf, other than to secure a volatile scene or to establish the need for or provide medical care, is "police interrogation" in the colloquial sense, and thus testimonial per se [7-10]; moreover, this court concluded that an out-of-court incriminating statement that is not per se testimonial may still be testimonial in fact, and that the proper inquiry is whether a reasonable person in the declarant's position would anticipate the statement's being used against the accused in investigating and prosecuting a crime [10-15]. SOSMAN, J., concurring in part.

Discussion of the standard of review of an order that was the equivalent of the allowance of a motion to suppress. [15-16]

This court remanded for further proceedings the rulings of the District Court judge on the Commonwealth's motion in limine seeking to be allowed to admit in evidence certain out-of-court statements of the unavailable complainant and on the criminal defendant's motion to reconsider [18], and offered guidance as to whether (on the record as it stood before this court) the complainant's statements to police officers [16-17] and to her mother [17-18] would be barred under the confrontation clause of the Sixth Amendment to the United States Constitution. SOSMAN, J., concurring in part.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on June 16, 2004.

The case was reported by *Greaney*, J.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

*Brownlow M. Speer*, Committee for Public Counsel Services (*Jason Benzaken*, Committee for Public Counsel Services, with him) for the defendant.

SPINA, J. Hermany Gonsalves is charged with assault and battery and assault and battery by means of a dangerous weapon. The complainant is unavailable to testify at trial and previously has not been subject to cross-examination. A judge in the District Court determined in a pretrial ruling that out-of-court statements made by the complainant in response to questioning by a police officer and questioning by her mother were testimonial in nature and therefore inadmissible under the recent United States Supreme Court decision in *Crawford* v. *Washington*, 541 U.S. 36 (2004) (*Crawford*). The Commonwealth sought review of that ruling before a single justice, who thereafter reserved and reported the matter to the full court.

The *Crawford* case reestablished the principle that testimonial out-of-court statements are inadmissible under the confrontation clause of the Sixth Amendment to the United States Constitution, regardless of local rules of evidence, unless the declarant is available at trial or the declarant formally is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. Although the Supreme Court deferred articulating "a comprehensive definition of 'testimonial,' " it did determine that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68. The Court also noted that certain out-of-court statements are "by their nature . . . not testimonial — for example, business records or statements in furtherance of a conspiracy." *Id.* at 56. This case represents our first opportunity to interpret the confrontation clause in light of *Crawford*.

We hold that statements made in response to questioning by law enforcement agents are per se testimonial, except when the questioning is meant to secure a volatile scene or to establish the need for or provide medical care. Further, out-of-court statements that are not testimonial per se must be examined to determine if they are nonetheless testimonial in fact by evaluating whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting a crime.

1. *Background.* On March 16, 2003, the twenty year old complainant was in her bedroom with the defendant, her boy friend at the time. The complainant's mother was two rooms away, in her own bedroom. The mother is prepared to testify that she heard an argument between the complainant and the defendant with yelling, screaming, and crying. The mother went to the complainant's room to see what was wrong. The defendant had left and the complainant was lying on her bed, crying.

The mother would further testify that she asked the complainant what had happened and if the defendant had hit her. The complainant answered that she and the defendant had argued, that he had grabbed the front of her shirt so tight she could not breathe, and that he had hit her.

Neither the complainant nor her mother telephoned anyone for assistance, but about ten to fifteen minutes after the mother first heard the argument, the police arrived at the apartment. Two responding officers had received a dispatch for a domestic disturbance and arrived within a couple of minutes. They went straight to the second floor of the apartment building and spoke with the mother and the complainant.

As the defendant already had left, there was no active conflict at the time the officers arrived. Although upset, the complainant was verbal, mobile, and had no obvious injuries. The officers found the complainant crying and hysterical, ranting, loud, hyperventilating, and pacing around the room. One officer asked the complainant what happened and spoke with her about the situation for "probably not more than five minutes." In response to the officer's questioning, the complainant stated that her boy friend had grabbed her by the neck, lifted her off the ground, choked her, and hit her head on the floor. The complainant identified her boy friend by name and described him as a "medium-skinned black male," six feet, two inches tall, and weighing 275 pounds. After an ambulance arrived to take the complainant to a hospital, the officer remained at the scene and spoke to the mother for "a brief period," asking her what she saw. Any exchange that occurred between the second officer and the complainant or the mother is not in the record before us. The record similarly does not disclose what medical treatment the complainant received or whether the ambulance was part of the initial dispatch or summoned separately.

A complaint issued against the defendant and he was arraigned on charges of assault and battery and assault and battery by means of a dangerous weapon. On December 16, 2003, the Commonwealth filed a motion in limine seeking to be allowed to introduce the out-of-court statements made by the complainant, pursuant to the "spontaneous utterance" exception to the hearsay rule.[1] At that time, the complainant was available to testify, so the confrontation clause was not implicated. The

---

[1]The general exception involves a statement variously described as a "spontaneous exclamation," "spontaneous declaration," "spontaneous utterance," and "excited utterance." We use the term "spontaneous utterance" most recently appearing in cases and publications. See P.J. Liacos, M.S. Bro-

mother and one of the officers testified at the hearing on the Commonwealth's motion in limine. The other officer's proffered testimony was postponed until the day of trial, which has not yet occurred. Based on the preliminary hearing, the Commonwealth's motion to admit the out-of-court statements was allowed.

On March 31, 2004, the defendant filed a motion for reconsideration in light of the Supreme Court's *Crawford* decision (statement made by unavailable coconspirator was testimonial and therefore inadmissible under confrontation clause, notwithstanding its admissibility under statement against penal interest exception to State's hearsay rule). On April 2, 2004, the complainant invoked her privilege under the Fifth Amendment to the United States Constitution and therefore became unavailable to testify at trial. See *Commonwealth* v. *Galloway*, 404 Mass. 204, 208 (1989). At a hearing on the motion for reconsideration, the judge received further filings, but no testimony, and took the matter under advisement. On May 24, 2004, the judge vacated his prior ruling. He found, "These statements were clearly 'testimonial' and were made in response to interrogation." Therefore, based on the *Crawford* case he concluded "that these statements should not be admitted into evidence."

The Commonwealth sought review of that ruling through a petition pursuant to Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996), and a petition for relief pursuant to G. L. c. 211, § 3. The single justice thereafter reserved and reported the matter to the full bench.

2. *Legal framework.* a. *The* Crawford *decision.* The Sixth Amendment's confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Despite this language, under previous Supreme Court jurisprudence an unavailable witness's out-of-court statements were sometimes admissible at trial. Admissibility was determined by whether the statements displayed "adequate 'indicia of reliability'," similar

din, & M. Avery, Massachusetts Evidence § 8.16 (7th ed. 1999 & Supp. 2004).

to the rationale behind the rules of evidence related to hearsay. *Ohio* v. *Roberts*, 448 U.S. 56, 66 (1980).

The Supreme Court's recent decision in *Crawford* rejects the use of this reliability test for out-of-court statements that are "testimonial" in nature. The Court held that the Sixth Amendment imposes a complete bar to the admission of out-of-court statements that are determined to be testimonial unless (1) the declarant is available at trial or (2) the declarant is formally unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. With certain historic exceptions, all other out-of-court testimonial statements are barred, regardless of whether they possess any indicia of reliability. *Crawford, supra* at 68. The admissibility of nontestimonial out-of-court statements remains governed largely by State hearsay rules. *Id.* at 61, 68. See, e.g., *Commonwealth* v. *Whelton*, 428 Mass. 24, 29 (1998) (under Massachusetts law, proof of declarant's unavailability not required for admission of spontaneous utterance); *Commonwealth* v. *Fuller*, 399 Mass. 678, 682-683 (1987) (statement may be spontaneous exclamation, even if made in response to questions).

In *Crawford*, the Supreme Court declined to define precisely what statements are testimonial. Instead, it discussed various formulations of the "core class" of testimonial statements:

> "[1] 'ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially'; [2] 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions', *White* v. *Illinois*, 502 U.S. 346, 365 (1992) (Thomas, J., concurring in part and concurring in judgment); [or, 3] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' "

*Crawford, supra* at 51-52. The Supreme Court suggested these formulations share a "common nucleus," but did not define what that nucleus is. *Id.* at 52. Instead, it found that the state-

ment before it fit easily within any potential formulation of testimony, because it was "knowingly given in response to structured police questioning," *id.* at 53 n.4, and the Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Id.* at 68. Contrary to the suggestion of the concurring opinion, *post* at 31-32, the Supreme Court did not suggest that the three formulations, which are distinct alternatives, should be blended or harmonized.

The *Crawford* Court did conclude that certain statements are always testimonial. "Whatever else the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to [statements procured through] police interrogations." *Crawford, supra.* Such statements are per se testimonial and no further analysis is necessary.

b. *Interrogation.* The exact meaning of "police interrogations" — a question central to the matter before us — remains unclear from the *Crawford* decision alone. The Court noted:

> "Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse — a fact borne out time and again throughout a history with which the Framers were keenly familiar. This consideration does not evaporate when testimony happens to fall within some broad, modern hearsay exception, even if that exception might be justifiable in other circumstances."

*Id.* at 56 n.7. As to "interrogation" by law enforcement officers, the *Crawford* Court cautioned that it "use[d] the term 'interrogation' in its colloquial, rather than any technical legal, sense. . . . Just as various definitions of 'testimonial' exist, one can imagine various definitions of 'interrogation,' and we need not select among them in this case." *Id.* at 53 n.4.

We take this statement to mean that we are not to rely on the definitions of interrogation found throughout the *Miranda* v. *Arizona*, 384 U.S. 44 (1966), case law, but rather on everyday, common understandings of the term, both in the general public and the legal community. Webster's Third New Int'l Dictionary 1182 (1993) defines interrogation as "question[ing] typically with formality, command, and thoroughness for full information

and circumstantial detail." Black's Law Dictionary 838 (8th ed. 2004) offers definitions for three kinds of police interrogation: (1) custodial interrogation — "[p]olice questioning of a detained person about the crime that he or she is suspected of having committed"; (2) noncustodial interrogation — "[p]olice questioning of a suspect who has not been detained and can leave at will"; and (3) investigatory interrogation — "[r]outine, nonaccusatory questioning by the police of a person who is not in custody."

In light of the Supreme Court's direction to regard "interrogation" in its colloquial sense, rather than any technical legal sense, we hold that interrogation must be understood expansively to mean all law enforcement questioning related to the investigation or prosecution of a crime. At least one court has understood "interrogation" to include investigative police questioning of a complainant at a hospital following an alleged assault:

> "[T]he officers asked specific, purposeful questions and were in turn provided with detailed descriptions of the events that transpired and the defendant's involvement. These investigative, evidence producing actions bore statements which, if used to convict the defendant, would implicate the central concerns underlying the confrontation clause."

*People* v. *West,* 355 Ill. App. 3d 28, 35 (2005), citing *Crawford, supra* at 52-53.

If testimonial statements were limited to formal, solemnized, recorded accounts, *Crawford* would be a recipe to circumvent the confrontation clause by encouraging law enforcement personnel to take elaborate statements informally, as far from the court and the station house as possible.[2] Instead, *Crawford* represents a return to first principles in protecting the fundamental constitutional right to confront one's accusers.

---

[2]The Supreme Court has said, "We find it implausible that a provision which concededly condemned trial by sworn ex parte affidavit thought trial by *unsworn* ex parte affidavit perfectly OK" (emphasis in original). *Crawford* v. *Washington,* 541 U.S. 36, 52 n.3 (2004) (*Crawford*). In view of the Court's broad use of the term "interrogation," *id* at 53 n.4, it is similarly implausible that unsworn ex parte oral responses to police interrogation are "perfectly OK."

We conclude that questioning by law enforcement agents, whether police, prosecutors, or others acting directly on their behalf, other than to secure a volatile scene or to establish the need for or provide medical care, is interrogation in the colloquial sense. This includes "investigatory interrogation," such as preliminary fact gathering and assessment whether a crime has taken place.[3] Under our reading of *Crawford*, statements elicited by such interrogation are per se testimonial and therefore implicate the confrontation clause. No further analysis is needed. The statements are inadmissible unless the declarant testifies at trial or formally is unavailable and was previously subject to cross-examination.

Questioning by law enforcement agents to secure a volatile scene[4] or establish the need for or provide medical care is not colloquially understood as interrogation — it is not commonly understood as related to the investigation or prosecution of a crime. Rather, such questioning is considered part of the government's peacekeeping or community caretaking function, "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Commonwealth* v. *Evans*, 436 Mass. 369, 372 (2002), quoting *Cady* v. *Dombrowski*, 413 U.S. 433, 441 (1973). "[T]he community caretaking function is implicated if there is an objectively reasonable basis for believing that the safety of an

---

[3]There can be no doubt that interrogation involving preliminary fact finding is part of a criminal investigation. A criminal investigation may begin as soon as an officer turns her head, and some criminal trials have been defended successfully on a theory that the investigation focused prematurely on the wrong person.

[4]Although not the facts before us, we acknowledge that situations may occur in which the "volatile scene" is no longer restricted to the scene of the original incident, such as when law enforcement officers become aware that a fleeing party to the incident is driving while under the influence of alcohol or drugs, or if such a person is armed and known to be seeking to carry out specific threats, or certainly if a hostage is involved. These situations pose immediate danger to the safety of the community. In contrast, the volatile scene exception to the definition of interrogation does not encompass questioning meant to apprehend the perpetrator without a more concrete concern of impending harm. This case does not ask us to consider statements made during 911 telephone calls. We leave for a future appropriate case the treatment of emergency 911 telephone calls, and we do not accept the analysis of the concurrence, *post* at 32 n.7, concerning 911 telephone calls.

individual or the public is jeopardized." *Commonwealth* v. *Brinson*, 440 Mass. 609, 615 (2003), citing *Commonwealth* v. *Evans*, 436 Mass. 369 (2002) (police may inquire if driver needs assistance when car parked in breakdown lane); *Commonwealth* v. *Murdough*, 428 Mass. 760, 762 (1999) (police permitted to inquire about physical condition of driver asleep while parked at rest stop in cold weather); *Commonwealth* v. *Leonard*, 422 Mass. 504 (1996), cert. denied, 519 U.S. 877 (1996) (police permitted to open door of car parked in breakdown area if driver unresponsive). Cf. *Commonwealth* v. *Smigliano*, 427 Mass. 490, 492-493 (1998) (caretaking function inapplicable in absence of need for immediate assistance).

We do not agree with the views of the concurrence, *post* at 23-25, concerning the community caretaking function, or the need to secure a volatile scene. We also do not agree that judges will have difficulty distinguishing these functions from investigative functions. Both the community caretaking function and the need to secure a volatile scene are familiar to judges, and judges are well equipped to identify them. The community caretaking function does not depend, as the concurrence states, on answers to police questions, but on the existence of objective circumstances. See *Commonwealth* v. *Brinson, supra*; *Commonwealth* v. *Murdough, supra* at 762, 765. The need to secure a volatile scene also is analyzed under an objective standard. Cf. *Maryland* v. *Buie*, 494 U.S. 325, 327 (1990) (protective sweep of premises for safety of officers justified by objective standard).

Despite the broad scope of the confrontation clause as interpreted by *Crawford*, emergency questioning by law enforcement officers to secure a volatile scene or determine the need for or provide medical care cannot be said to be interrogation. Because the questioning is not interrogation, any out-of-court statements it elicits are not testimonial per se and must be evaluated on a case-by-case basis to determine whether they are testimonial in fact.[5]

c. *Statements not testimonial per se*. Statements made in

[5]While the current facts before us may not implicate this exception, the record remains open. Further, the issue arises squarely in a case decided today. See *Commonwealth* v. *Foley, post* 1001, 1002 (2005).

response to emergency questioning by law enforcement to secure a volatile scene or determine the need for or provide medical care are not per se testimonial. The same is true for out-of-court statements made in response to questions from people who are *not* law enforcement agents, and statements offered spontaneously, without prompting, regardless of who heard them. While the Supreme Court was able to set aside developing a test with which to analyze the testimonial qualities of out-of-court statements that do not fall into one of the per se categories, we need such a tool to resolve the matter before us.

*Crawford* offers some guidance on how to identify whether a statement is testimonial in fact through its review of the history and function of the confrontation clause and through its discussion of the "core class" of testimonial statements, outlined above. *Crawford, supra* at 43-52. Although the Court did not define the "common nucleus" of the various formulations of testimonial statements to which it referred, *id.* at 52, one court has understood the common nucleus to be whether a declarant would reasonably believe that his or her statement might be used at trial. See *United States* v. *Saget*, 377 F.3d 223, 228-229 (2d Cir. 2004), cert. denied, 543 U.S. 1079 (2005) ("*Crawford* at least suggests that the determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at a trial"). But see *Hammon* v. *State*, 809 N.E.2d 945, 952 (Ind. Ct. App. 2004), vacated, 829 N.E.2d 444 (Ind.), cert. denied, 126 S. Ct. 552 (2005) ("It appears to us that the common denominator underlying the Supreme Court's discussion of what constitutes a 'testimonial' statement is the official and formal quality of such a statement").

Questions concerning the meaning of "common nucleus" aside, other courts have focused on the purpose for which the statement is made or procured, that is, whether the statement is made or procured to prove or establish facts in judicial proceedings. See, e.g., *People* v. *West*, 355 Ill. App. 3d 28 (2005) (specific content, purpose, and facts surrounding each statement inseparable from analysis); *People* v. *Cortes*, 4 Misc. 3d 575 (N.Y. Sup. Ct. 2004) (discussing importance of purpose of statement in determining whether testimonial).

The United States Court of Appeals for the Sixth Circuit, in

its direct review of a *Crawford*-type case similar to this, offers the following test:

> "If the judicial system only requires cross-examination when someone has formally served as a witness against a defendant, then witnesses and those who deal with them will have every incentive to ensure that testimony is given informally. The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying *whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime"* (emphasis added).

*United States* v. *Cromer,* 389 F.3d 662, 675 (6th Cir. 2004). See *United States* v. *Pugh,* 405 F.3d 390, 399 (6th Cir. 2005) (applying *Cromer* test). See also *United States* v. *Summers,* 414 F.3d 1287, 1302 (10th Cir. 2005) ("a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation *or* prosecution of a crime" [emphasis added][6]).

The *Cromer* formulation does not rely on the declarant's knowledge of trial procedure or the formality of the statement.[7] Rather, it focuses on the declarant's intent by evaluating the specific circumstances in which the out-of-court statement is made. Therefore, it is a formulation that would find testimonial *all* statements the declarant knew or should have known might be used to investigate or prosecute an accused. Barring further instruction from the Supreme Court, we adopt this articulation as the approach most consistent with *Crawford* and the historical purpose of the confrontation clause. An out-of-court incriminating statement that is not per se testimonial still may be testimonial in fact. The proper inquiry is whether a reasonable person in the declarant's position would anticipate the

---

[6]We see no appreciable difference between the phrase "investigating and prosecuting the crime," *United States* v. *Cromer,* 389 F.3d 662, 675 (6th Cir. 2004), and "investigation or prosecution of a crime" in *United States* v. *Summers,* 414 F.3d 1287, 1302 (10th Cir. 2005).

[7]Formal statements are per se testimonial under *Crawford.*

statement's being used against the accused in investigating and prosecuting a crime.[8]

In light of our definition of "testimonial statements," the judges of the Commonwealth must remain engaged gatekeepers, evaluating any out-of-court statements offered without benefit of confrontation. First, the judge must determine whether the statement is part of an affidavit, deposition, confession, or prior testimony at a preliminary hearing, before a grand jury, or at a former trial, or if it was procured through law enforcement interrogation (which does not include emergency questioning by law enforcement to secure a volatile scene or determine the need for or provide medical care). If so, it is per se testimonial and the confrontation clause applies. The statement is inadmissible unless the declarant testifies at trial or formally is unavailable and previously was subject to cross-examination.

If the statement is not per se testimonial, the judge still must conduct a further fact-specific inquiry regarding whether a reasonable person in the declarant's position would anticipate the statement's being used against the accused in investigating and prosecuting the crime. As we have indicated above, judges are well suited to conduct this inquiry with respect to statements made to a police officer engaged in the community caretaking function or while securing a volatile scene. If the judge concludes the statement is testimonial, the confrontation clause governs its admissibility. The statement is inadmissible unless the declarant testifies at trial or formally is unavailable and previously was subject to cross-examination. If judge finds that an out-of-court statement is not testimonial, then the Commonwealth's rules of evidence alone govern admissibility, usually in relation to hearsay.

We recognize the ground shift this means for the prosecution of crimes, in strategy and method. The remedy of calling out-of-court declarants to the stand will not always be available, although it should be noted that they need only appear, not af-

---

[8]In determining the circumstances in which the statement was made, and therefore what a reasonable person in the declarant's position would anticipate, a judge may consider evidence of the purposes for which the statement was made or procured and thus take into account potential manipulations by the questioner or declarant. As mentioned in note 4, *supra*, we leave for an appropriate case the treatment of emergency 911 telephone calls.

firm their previous statement. See *Commonwealth* v. *Moquette*, 439 Mass. 697 (2003) (declarants' spontaneous utterances recanted at trial were sufficient, without other corroboration, to support conviction). Likewise, we recognize the particular impact this decision may have on the prosecution of domestic violence, as well as some gang-related crimes, which have been prosecuted not infrequently based on out-of-court statements in the absence of the initial complaining witness. See, e.g., *Commonwealth* v. *Whelton*, 428 Mass. 24, 28-30 (1998). In such cases, however, the prosecution can still present powerful evidence that a crime has occurred and that the defendant was the perpetrator. In the case at bar, the Commonwealth could offer the responding officer's testimony as to the complainant's physical appearance, her screams, her medical records, and photographs, as well as testimony from the mother as to the complainant's screams and the fact that no one else was in a position to have inflicted her injuries. There will be an unavoidable adjustment period as past practices are modified and new approaches are developed. With full awareness of the challenges, we see no other way to be true to the dictates of the confrontation clause as it is now understood. The system, over time, must adjust.

Nothing in what we decide today is meant to change the Commonwealth's laws regarding the admissibility of spontaneous utterances under the hearsay rules. Despite the Commonwealth's assertion to the contrary, this case is not about spontaneous exclamations. The constitutional provision of the confrontation clause trumps the common-law rules of evidence, but a statement can be both testimonial in nature and a spontaneous utterance. Whether some out-of-court statements are admissible under exceptions to the hearsay rule does not change whether admitting them would violate the confrontation clause as newly articulated by *Crawford*.

Nothing in *Crawford* indicates the two are mutually exclusive. In fact, quite the contrary. In dicta in a footnote, the Court suggested such utterances can be testimonial, depending on the applicable State's hearsay law.

"One case arguably in tension with the rule requiring a

prior opportunity for cross-examination when the proffered statement is testimonial is *White* v. *Illinois*, 502 U.S. 346 (1992), which involved, inter alia, statements of a child victim to an investigating police officer admitted as spontaneous declarations. *Id.* at 349-351. It is questionable whether testimonial statements would ever have been admissible on that ground in 1791; to the extent the hearsay exception for spontaneous declarations existed at all, it required that the statements be made 'immediat[ely] upon the hurt received, and before [the declarant] had time to devise or contrive any thing for her own advantage.' *Thompson* v. *Trevanion*, Skin. 402, 90 Eng. Rep. 179 (K.B. 1694). In any case, the only question presented in *White* was whether the [c]onfrontation [c]lause imposed an unavailability requirement on the types of hearsay at issue. See 502 U.S. at 348-349. The holding did not address the question whether certain of the statements, because they were testimonial, had to be excluded *even if* the witness was unavailable. We '[took] as a given . . . that the testimony properly falls within the relevant hearsay exceptions.' *Id.* at 351, n.4."

*Crawford, supra* at 58 n.8.

In the *White* case, the applicable law of spontaneous utterances was that of Illinois, which, unlike the law quoted in *Crawford* from 1694, did not require the statements be made "immediately upon the hurt received." Indeed, those spontaneous utterances were made forty-five minutes afterward. *White* v. *Illinois, supra* at 349-350. The footnote in *Crawford* thus suggests that, at least under a view of spontaneous utterances as broad as that at issue in *White*, a spontaneous utterance sometimes may be testimonial in nature. The same would be true in Massachusetts, because the Commonwealth similarly has broad rules regarding what may be admissible under our spontaneous exclamation exception to the hearsay rule. See P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 8.16 (7th ed. 1999 & Supp. 2004).

3. *Standard of review.* Because the judge's order effectively prevents the Commonwealth's case against the defendant from proceeding, our review of the order is proper under Mass. R. Crim. P. 15 (a), as appearing in 422 Mass. 1501 (1996), as the

equivalent of the allowance of a motion to suppress. *Commonwealth* v. *Anderson*, 401 Mass. 133, 135 (1987), citing Mass. R. Crim. P. 15 (b) (2), as amended, 397 Mass. 1225 (1986). When reviewing such a motion on appeal, "we adopt the motion judge's subsidiary findings of fact absent clear error, but we independently determine the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Catanzaro*, 441 Mass. 46, 50 (2004), citing *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977), *S.C.*, 398 Mass. 806 (1986), and cases cited.

4. *Application to the complainant's statements.* The transcript of the hearing on the motion in limine is the record before us. The mother and only one of the two responding officers testified, and their testimony was solicited before *Crawford* was decided. There is sufficient evidence in the record to support a determination that the complainant's statements qualified under the Commonwealth's spontaneous exclamations exception to the hearsay rule, but it is the confrontation clause issues that ultimately will decide this matter. It is possible that, with the benefit of this opinion, the Commonwealth or the defense will be able to elicit a more comprehensive and favorable record after remand, when further evidence may be presented. Today, we offer guidance by applying *Crawford* to the testimony as it currently stands.

a. *Complainant's statements to the police officers.* The officer's questioning and the statements he attributed to the complainant in response related to the identity of the perpetrator, including his name, race, height, and weight, and the details and circumstances of the assault. He spoke with her for more than a few minutes, garnering specific details that he recorded in his incident report.

The transcript indicates that, by the time the officers arrived, although the complainant remained upset, the situation had diffused. The testifying officer stated that he was informed the assailant was no longer present. Nothing in the record indicates that his questioning of the complainant was designed to secure the scene. Although the complainant reported being physically attacked, the officer's testimony did not mention inquiry about any medical needs. The complainant was mobile, verbal, and

responsive, and no one reported seeing any marks on her. Although apparently an ambulance arrived not long after the police did, there is no indication who summoned the ambulance or what treatment the complainant received.

Were the record before us complete and final, we would have to conclude that the statements the complainant made to the police were made in response to investigatory interrogation. The officer appears to have procured information about the nature of the alleged crime and the identity of the accused in order to begin to build a criminal prosecution. The questioning does not appear intended or necessary to secure a volatile scene or procure needed medical attention, so the statements elicited were per se testimonial and their admission is governed by confrontation clause principles.[9] Because the complainant was not previously subject to cross-examination, if she remains unavailable, her statements made to the police would be inadmissible on this record.

b. *Complainant's statements to her mother.* It will be rare for a statement made by one private citizen to another to be considered to be police interrogation. See, e.g., *Commonwealth v. Snyder*, 413 Mass. 521, 531-532 (1992) (private citizen not acting as agent of police for purposes of eliciting statements is not involved in police interrogation). This is not one of those occasions. The statements all were made in response to the mother's questions before the police arrived. Neither the mother nor the complainant telephoned the police, nor apparently were they aware that the police had been contacted. The complainant's statements to her mother therefore were not per se testimonial (not part of an affidavit, deposition, confession, or prior testimony at a preliminary hearing, before a grand jury, or at a

---

[9]The complainant's motives for offering the information to the police officer are unknown, especially given the unique dynamics of domestic violence cases. See *State* v. *Wright*, 686 N.W.2d 295, 303 (Minn. Ct. App. 2004) (majority concluded 911 call indicates request for immediate intervention); *id.* at 309 (Hudson, J., concurring specially in part and dissenting in part) (discussing mixed motives in domestic violence cases). Because the statements were offered in response to police interrogation, however, the complainant's motivation, and whether a reasonable person in her position would anticipate her statement's being used against the defendant in investigating and prosecuting the crime, are irrelevant to our inquiry. Her statements were per se testimonial.

former trial, or procured through law enforcement interrogation) and therefore must be evaluated on a fact-specific basis.

On the limited record before us, it appears that the purpose for which the mother procured the statements from the complainant was to understand what had happened, not to establish a basis for prosecution. Nothing in the record indicates the complainant offered the statements in order to establish the facts for later use by law enforcement. We see no reason why a reasonable person in the complainant's position would anticipate that her statement, made in her own bedroom, to her mother, apparently without any knowledge that the police would become involved, would be used against the defendant in investigating and prosecuting the alleged assault. Therefore, the complainant's statements to her mother, on this record, would not be testimonial. Only the Commonwealth's rules of evidence would apply. Any finding to the contrary would represent an error of law.

5. *Conclusion.* In light of *Crawford* v. *Washington,* 541 U.S. 36 (2004), and this opinion, the parties must be given the opportunity to reopen the evidence regarding admissibility of the out-of-court statements before the matter proceeds to trial. The rulings of the District Court judge on the motion in limine and the motion to reconsider the motion in limine are vacated and the matter is remanded for further pretrial proceedings consistent with this opinion.

*So ordered.*

SOSMAN, J. (concurring in part). The present case calls on this court to craft working definitions of two terms used, but conspicuously not defined, in *Crawford* v. *Washington,* 541 U.S. 36, 53 n.4, 68 & n.10 (2004) (*Crawford*). In *Crawford,* the United States Supreme Court held that the introduction of "testimonial" statements made by a declarant who does not testify at trial is prohibited by the confrontation clause, unless the declarant is unavailable at trial and the defendant had a previous opportunity to cross-examine the declarant. *Id.* at 68. However, while providing various possible "formulations" of

what statements might be considered "testimonial," the Court did not define the term or even signal any preference amongst the "formulations" offered. *Id.* at 51-52, 68. We do know that, whatever else may be included within the term "testimonial," it encompasses statements procured by way of police "interrogation," but, again, the Court expressly declined to define what it meant by police "interrogation" for these purposes. *Id.* at 52, 53 n.4.

Although the exercise is fraught with uncertainty due to the Supreme Court's refusal to define the terms used in *Crawford*, courts across the country have had to interpret and apply the requirements of *Crawford* to the common fact pattern now before us: spontaneous utterances made by victims (and other eyewitnesses) to officers arriving at the scene in response to an emergency 911 call. Few courts have given *Crawford*'s undefined terms the extreme interpretation adopted today. While today's opinion properly allows the parties to reopen the record below to present additional evidence in light of *Crawford*, it erroneously signals that, unless the police questions were specifically aimed at defusing a "volatile" scene or attending to the complainant's medical needs, the police questions automatically amounted to "interrogation" and the statements made in response were therefore "testimonial." In accord with many other courts, I believe that "police interrogation" does not encompass the basic, immediate, on-scene questioning of persons present in an attempt to get the gist of what is happening or has just happened, i.e., to ascertain why police were called to the scene and what steps need to be taken in response.

And, if the declarant's statements are not the product of "police interrogation," and we must therefore turn to the more general "formulations" of the term "testimonial," today's decision adopts a definition of "testimonial" that goes well beyond any of those formulations. It also ignores the fact that the predicates for introduction of a statement as a spontaneous utterance will, as a practical matter, make it unlikely in the extreme that the statement was "testimonial," even if the statement was made to the police. This, too, is the position now being adopted by many courts across the country. In accord with those other jurisdictions, I do not interpret *Crawford* to prohibit

the introduction of spontaneous utterances given in response to this kind of preliminary police questioning, and would, on the record compiled to date, allow the introduction of at least the initial statements made to the police by the complainant.[1] I thus agree that the case needs to be remanded for a more complete record addressing the requirements of *Crawford*, but do not agree with today's articulation of those requirements.

1. *"Police interrogation."* Statements procured by "police interrogation" are one subcategory of "testimonial" statements. *Crawford, supra* at 68. While recognizing that there could be "various definitions of 'interrogation' " in this context, the Court declined to suggest — let alone adopt — any definition. *Id.* at 53 n.4. The only guidance provided tells us that we must use the term "in its colloquial, rather than any technical legal, sense." *Id.* Lacking any definition, we must consider the Court's reasons for treating statements procured by "police interrogation" as inherently "testimonial," and, with particular reference to the issue before us, how those reasons are or are not implicated in the kind of preliminary questioning conducted by police on arrival at the scene in response to an emergency 911 telephone call.

The Court included responses to "[p]olice interrogations" within the category of "testimonial" statements because such interrogations "bear a striking resemblance to examinations by justices of the peace in England," noting that justices of the peace performed investigative functions in that earlier era comparable to investigative functions now performed by police. *Crawford, supra* at 52-53. While justice of the peace examinations were investigative in the sense that they were oriented toward establishing the case for the prosecution and not conducted in the manner of neutral magistrates, they do not appear to have included on-scene preliminary questioning in the immediate aftermath of an unsolved crime, but were instead conducted only after someone had been accused and brought before them. See 4 W. Blackstone, Commentaries 293-296 (8th ed. 1878); 2 M. Hale, Pleas of the Crown 120-121 (1800). And as described in *Crawford*, such examinations were frequently

---

[1] I agree with the court that, on the record before us, the statements made by the complainant to her mother are not "testimonial." *Ante* at 17-18.

under oath, and reduced to writing to be "read" in court. *Crawford, supra* at 43-44. See *Anderson* v. *State*, 111 P.3d 350, 357-358 (Alaska Ct. App. 2005) (Mannheimer, J., concurring) ("police interrogation" in *Crawford* refers to "the kind of formal, systematic questioning that was characteristic of the English inquisitorial practices that prompted the enactment of the [c]onfrontation [c]lause"). The "police interrogation" that resembles a justice of the peace examination is thus the more thorough, complete interview, often conducted later at the station and reduced to writing or recorded.

The Court's reasons for applying the confrontation clause to statements procured by "police interrogation" also included a more general concern about the evil the confrontation clause was intended to address. "Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse — a fact borne out time and again throughout a history with which the Framers were keenly familiar." *Crawford, supra* at 56 n.7. However, when the police arrive at the scene and ask basic, preliminary questions (e.g., "What's going on?"), they do not know whether they will be told about a crime, an accident, a misunderstanding or a false alarm; nor do they know whether anyone will report that there is some injury or imminent danger that needs their attention. When the police are trying to ascertain such basic information, they do not yet have "an eye toward trial," *id.* — they are trying to find out, among other things, whether there is even any crime to be investigated, and they are simultaneously trying to ascertain whether there is any ongoing threat or need for medical attention. Such preliminary questions on arrival at the scene ("What's happening?" "What did he do?" "Where is he now?") are not intended to produce "testimony" but to assess the situation and inform the officers' decision as to what immediate steps they must take. I see no "unique potential for prosecutorial abuse," *id.*, in such preliminary inquiries.

Once the police are in fact investigating an alleged crime and preparing a case for potential prosecution, police questioning that takes on some aura of formality, solemnity, or (at a minimum) thoroughness, is what makes it "interrogation" for purposes of the confrontation clause. As today's decision

acknowledges, the dictionary definition of "interrogation" is "question[ing] typically with formality, command, and thoroughness for full information and circumstantial detail." *Ante* at 7-8, quoting Webster's Third New Int'l Dictionary 1182 (1993). See American Heritage Dictionary 685 (4th ed. 2000) (defining "interrogate" as "[t]o examine by questioning formally or officially"); Merriam-Webster's Dictionary of Law (1996) ("to question formally and systematically"). That is the "colloquial" understanding of what "interrogation" entails, *Crawford, supra* at 53 n.4, and that is the definition we should be applying to comply with *Crawford.*[2]

The proposition that "police interrogation" involves structured, thorough, and detailed questioning has considerable support in cases to date. See, e.g., *Mungo* v. *Duncan*, 393 F.3d 327, 336 n.9 (2d Cir. 2004), cert. denied sub nom. *Mungo* v. *Greene*, 544 U.S. 1002 (2005) (rejecting proposition that "interrogation" encompasses "any asking of questions," in favor of dictionary definition "to question typically with formality, command, and thoroughness for full information and circumstantial detail," as that definition was "more consistent" with types of testimonial statements mentioned in *Crawford*); *Anderson* v. *State, supra* at 353 ("interrogation" refers to "category of formal, official, and systematic questioning"); *People* v. *Corella*, 122 Cal. App. 4th 461, 468 (2004) ("police interrogation" under *Crawford* "requires a relatively formal investigation where a trial is contemplated"); United States *vs.* Webb, D.C. Sup. Ct. No. DV-339-0400 (Nov. 9, 2004); *State* v. *Hembertt*, 269 Neb. 840, 850 (2005) ("structured police questioning"). See also *Hammon* v. *State*, 829 N.E.2d 444, 457 (Ind. 2005) ("police interrogation" for purposes of confrontation clause "is properly limited to attempts by police to pin down and preserve statements").

Some courts have taken the extreme position that essentially

---

[2]In *Crawford* v. *Washington*, 541 U.S. 36 (2004) (*Crawford*), the police had acted with considerable formality and thoroughness — the "structured police questioning" of the witness had been tape recorded. *Id.* at 53 n.4. Such a formalized interview, conducted after the defendant had been arrested and the witness (the defendant's wife) had been given her Miranda warnings, was obviously a form of "interrogation," and the Court therefore did not need to address the outer limits of what it meant by "interrogation." *Id.*

all police questioning of witnesses constitutes "police interrogation." See, e.g., *Moody* v. *State*, 277 Ga. 676, 679-680 & n.6 (2004) ("police interrogation" encompasses "field investigation of witnesses"); *State* v. *Sutton*, 609 S.E.2d 270, 275 (N.C. Ct. App. 2005) (when police question crime victim, "that officer clearly has 'an eye toward trial' "); *Wall* v. *State*, 143 S.W.3d 846, 851 (Tex. Ct. App. 2004). If the Supreme Court intended to sweep any and all police questioning within the ambit of "interrogation" and render all responses thereto "testimonial," that would have been an easy definition to craft. The Court did not do so. Instead, the Court indicated that the term police "interrogation" was to be used "in its colloquial, rather than any technical legal, sense," *Crawford, supra* at 53 n.4, and we must therefore focus on whether a lay person would consider a particular form of police questioning to be "interrogation."

Today's decision takes the position that "police interrogation" encompasses "all law enforcement questioning related to the investigation or prosecution of a crime," including "preliminary fact gathering and assessment whether a crime has taken place," *ante* at 8, 9, an approach that is essentially as extreme as the above-cited cases. From this admittedly "expansive[]" definition, *ante* at 8, the court today does carve out an exception for circumstances where, in addition to investigating criminal conduct, the police are simultaneously addressing a "volatile scene" or attending to a complainant's medical needs, because those tasks come within "the government's peacekeeping or community caretaking function." *Ante* at 9. Of course, when criminal conduct has engendered some imminent threat to safety, *ante* at 9 n.4, or has resulted in some form of medical emergency, police who respond to the scene are not asking questions that are unique to their caretaking as opposed to their investigative function. They are performing both functions at the same time, and customarily using the same questions. It strikes me as arbitrary, unsupported by any language in *Crawford*, and unrelated to the purposes served by the confrontation clause, to have admissibility of a witness's response to such questions hinge on the fortuity that the criminal activity that the police have come to investigate happens

simultaneously to involve some aspect of their caretaking function.

In the wake of today's opinion, we will be embroiled in arguments over whether particular questions at the scene had some possible link to the community caretaking function, despite their obvious overlap with criminal investigation. By their nature, for example, questions about what was done to the victim during the attack (how many blows, to what portion of the victim's body, with what weapon) simultaneously seek information about what injuries the victim sustained that might need medical attention and information that provides the basic elements of the crime committed. I foresee much hairsplitting, as attorneys wrangle and judges attempt to separate the "caretaking function" questions from the "investigative" questions. Nothing in *Crawford* suggests the parsing exercise that today's opinion has launched, and it is an exercise that will prove difficult to perform.[3]

Moreover, today's distinction (between questions asked to assess "whether a crime has taken place" and questions asked to address a public safety threat or a medical emergency at the scene of that crime) makes the term "police interrogation" depend not on the questions that the police are asking but on the responses they get to those questions. For example, if the police respond to a call that a woman has been attacked in her home by a knife-wielding intruder, they will presumably ask the victim where the alleged perpetrator is — if she tells the police that the armed perpetrator is still hiding somewhere in the house, she has informed the police of a potentially "volatile scene" (thus bringing the exchange within some "caretaking" func-

---

[3]Taken literally, it would also mean that responses to some isolated questions posed at the scene would be admissible, if the specific question can, for example, be linked to assessing the victim's injuries, while responses to other questions that would give some context to that answer will have to be excluded. Not only will courts be taxed with the difficult task of separating "community caretaking" inquiries from "investigative" inquiries, but jurors will be left to figure out what certain isolated responses to "caretaking" questions, shorn of their context in a sequence of questions, mean. This fragmented presentation of little bits and pieces of what a witness said at the scene will invite juror speculation and misunderstanding (e.g., jurors will ask themselves, "If she told the police about her wounds and how she got them, why didn't she tell the police that the defendant was the one who did it?").

tion), but if she tells the police that the perpetrator fled on foot in a particular direction, she has given them information pertinent only to their investigative function. Similarly, if the police ask that victim what the perpetrator did, the victim's response that he slashed her arm while she tried to fend him off will give the police information about a wound that may need medical care, but a response that he pointed the knife at her will merely describe an assault that did not lead to any physical injury requiring medical intervention. "Interrogation" surely refers to the nature of the questioning conducted by the police, and is not dependent on the substantive contents of the witness's answers to police questions.

Questioning by police on their arrival at the scene simultaneously addresses a range of issues that might lead to further police action of various forms. When the police ask those questions, they do not yet know what answers they will get or what actions they will take. When responding to an emergency call, they are addressing that emergency, not getting ready for trial. Police questioning in these circumstances is quick, open ended, impromptu, informal, not under oath, not reviewed by the witness, not detailed or thorough. Lay persons would not call this "interrogation," and neither should we. It bears no resemblance whatsoever to justice of the peace examinations; it is not the historical evil that the confrontation clause was meant to cure; and it is not what *Crawford* meant to address.

Many courts have treated such preliminary questioning at the scene as outside the purview of "police interrogation." See, e.g., *Mungo* v. *Duncan*, 393 F.3d 327, 336 n.9 (2d Cir. 2004), cert. denied sub nom. *Mungo* v. *Greene*, 544 U.S. 1002 (2005) (initial questioning at scene, during pursuit, and immediately after apprehension of suspects not "interrogation," but victim's statements probably became "testimonial" when officer pressed victim for additional clarification of his ambiguous identification, as that line of questioning entailed "greater formality with a view to creating a record and proving charges")[4]; *Anderson* v. *State*, 111 P.3d 350, 356 (Alaska Ct. App. 2005) ("excited re-

---

[4] In *Mungo* v. *Duncan*, 393 F.3d 327, 336 & n.9 (2d Cir. 2004), cert. denied sub nom. *Mungo* v. *Greene*, 544 U.S. 1002 (2005), the court declined to apply *Crawford* retroactively, but, in a lengthy footnote, indicated how it would

sponses to brief on-the-scene questioning by police officers" not "testimonial"); *People* v. *Corella*, 122 Cal. App. 4th 461, 468 (2004) (preliminary questions at scene shortly after crime is "an unstructured interaction," not "interrogation"); United States *vs.* Webb, D.C. Sup. Ct. No. DV-339-0400 (Nov. 9, 2004) ("it is exceedingly unlikely that the Supreme Court intended to exclude from evidence excited utterances made during investigatory questioning at the scene of a crime soon after the criminal event," finding nontestimonial victim's response to officer's general questions of "what happened" and "why"); *Hammon* v. *State*, 829 N.E.2d 444, 457 (Ind. 2005) ("responses to initial inquiries by officers arriving at a scene are typically not testimonial"); *State* v. *Hembertt*, 269 Neb. 840, 853-854 (2005) (victim's statement to police on arrival not "testimonial," but subsequent interview of victim after suspect apprehended properly excluded as "testimonial"); *Key* v. *State*, 173 S.W.3d 72, 75 (Tex. Ct. App. 2005) ("initial police-victim interaction at the scene of an incident is not an interrogation"). See also *People* v. *Mackey*, 5 Misc. 3d 709, 712 (N.Y. Crim. Ct. 2004) ("responses to police officers during a preliminary field investigation" not testimonial if encounter "lack[s] the requisite formality to constitute a police interrogation"); *State* v. *Forrest*, 164 N.C. App. 272, 280 (2004), aff'd, 611 N.C. 833 (2005) (where victim initiated spontaneous statements to police when they arrived at scene, follow-up questions and answers were not testimonial).[5] Indeed, this interpretation is now recognized as "the emerging majority view" of *Crawford* as it relates to initial police questioning at the scene of a crime. *Anderson* v. *State*, *supra* at 356. See *Spencer* v. *State*, 162 S.W.2d 877, 881 (Tex. Ct. App. 2005).

It may take very few questions and very little time before preliminary police questioning ripens into something more thorough, more pointed, or more detailed, and thus crosses the

likely analyze the statements in question under *Crawford*.

[5]Some courts even extend this principle beyond the immediate response to the scene. See, e.g., *People* v. *Newland*, 6 A.D.3d 330, 331 (N.Y. 2004) ("brief, informal remark to an officer conducting a field investigation" not testimonial); *Cassidy* v. *State*, 149 S.W.3d 712, 716 (Tex. Ct. App. 2004), cert. denied, 544 U.S. 925 (2005) (police questioning of victim at hospital one hour after stabbing not "interrogation" for purposes of *Crawford*).

line into "interrogation." See, e.g., *Mungo* v. *Duncan, supra* at 336 n.9; *State* v. *Hembertt, supra* at 850. The questioning need not be as structured, or the setting as formal, as in *Crawford* itself. At some point after the police have the rudimentary information gleaned on their arrival at the scene of a crime, it is customary that the police seek to obtain some more detailed, orderly, and complete account of the incident, asking specific and probing questions to address any gaps or inconsistencies in the witnesses' answers, and the police then commonly preserve the witnesses' information in a subsequent report. In its "colloquial" sense, that kind of questioning is "interrogation." *Crawford, supra* at 53 n.4. However, the "colloquial" understanding of the term "police interrogation" does not include the officer, responding to a report of some domestic disturbance, who enters the home and addresses all persons present with the question, "What's going on?"

While it may in some cases be difficult to draw a precise line as to when preliminary questioning ends and "interrogation" begins, it is a line that we can discern, and to the extent that it is difficult to do so, it is at least a distinction that has some relevance to the underlying purpose of the confrontation clause. Where "interrogation" does not and should not encompass any and all police questioning, a line must be drawn somewhere, and I believe that other courts distinguishing between preliminary on-scene questioning and "interrogation" are focusing on an appropriate distinction. Today's proposed line — determining whether a particular question can be justified by reference to community caretaking even if it simultaneously overlaps with criminal investigation — will be even more difficult to draw, and the distinction is irrelevant to the purposes underlying the confrontation clause.

The record in the present case was sparse with respect to how detailed or thorough the police questioning of the complainant ultimately became. The evidence concerning her statements to the responding officers was developed for the purpose of determining whether the requisites for the spontaneous utterance exception had been established, not with an eye toward whether (or at what point) the questioning that elicited those spontaneous utterances had become a "police interrogation." In light of *Crawford*, I agree that the record needs to be reopened

to address that issue. However, I do not think that resolution of the issue hinges on such things as how the ambulance came to be summoned, or whether the police questions were motivated by concern for the complainant's medical needs. Rather, what should be examined is whether and at what point the questions being asked of the complainant became sufficiently detailed, structured, or pointed that a layperson would describe her as being "interrogated" by the police. Once the police questioning crossed that line, the complainant's responses were, by definition, "testimonial" under *Crawford.*

2. *"Testimonial."* If it is determined that the complainant made some statements prior to the onset of any "police interrogation," the judge must still assess whether those statements are nevertheless "testimonial" within the meaning of *Crawford.* Responses to "police interrogation" comprise merely one subset of "testimonial" statements, and a statement made to police that is not the product of "police interrogation" may still be "testimonial" for some other reason.

Again operating without any definition of "testimonial," we must start the analysis by reviewing the three differing general formulations of "testimonial" noted by the Court in *Crawford.* Although not expressly approved or adopted by the Court, those formulations were at least given some general imprimatur by way of quotation within the text of the opinion. They are as follows: "[1] ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; [2] "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; [3] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" (citations omitted). *Crawford, supra* at 51-52.

Today's decision reaches beyond these formulations and declares a statement "testimonial" whenever "a reasonable person in the declarant's position would anticipate the statement's being used against the accused in investigating and

prosecuting a crime." *Ante* at 12-13. This articulation of the test is drawn from *United States* v. *Cromer*, 389 F.3d 662, 675 (6th Cir. 2004) (*Cromer*). Under this test, essentially anything said to law enforcement or government officials that pertains to any form of criminal activity is "testimonial" — after all, a reasonable person would anticipate that giving any government official information concerning criminal conduct will engender at least an investigation and, if the investigation bears fruit, a prosecution. Under *Cromer*'s definition, any "statement made knowingly to the authorities that describes criminal activity is almost always testimonial." *Id.,* quoting Friedman, Confrontation: The Search for Basic Principles, 86 Geo. L.J. 1011, 1042 (1998). Indeed, in a more recent case, the United States Court of Appeals for the Sixth Circuit confirmed just how expansive its definition of "testimonial" was. In considering whether statements made during an emergency 911 call and two later statements made in person to the police were testimonial, the court noted that "[o]n all three occasions, [the declarant] made the statements to government officials: the police. This fact alone indicates that the statements were testimonial" (footnote omitted). *United States* v. *Arnold,* 410 F.3d 895, 903 (6th Cir. 2005).

Before adopting this all-encompassing definition, we should first compare it to the formulations articulated in *Crawford* itself. The closest kin to the *Cromer* articulation, but with a distinct and important difference, is the third *Crawford* formulation: statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford, supra* at 52. While this *Crawford* formulation focuses on the declarant's appreciation of the potential use of the statement "at a later trial," *id., Cromer* sweeps more broadly and renders testimonial any statement made by a declarant who should reasonably anticipate use of the statement "in investigating and prosecuting the crime." *Cromer, supra* at 675. Any form of accusation or statement concerning criminal activity would cause a reasonable person to anticipate that an investigation will follow, but not every such accusation or statement is made with an eye toward trial. Indeed, statements made in the presence of police arriving

while the crime is still in progress (e.g., a hostage screaming, "Watch out! They both have guns! They threatened to shoot me if anyone comes near!") would be testimonial under *Cromer* — the declarant would reasonably expect that the police would later use that information to investigate and ultimately prosecute the perpetrators. The *Cromer* approach thus treats as "testimonial" a vast array of informal statements that are not made for purposes of trial, whereas *Crawford*'s third formulation of "testimonial" (and the historical evil to which the confrontation clause is addressed) is focused on statements made and preserved specifically for use at trial.

Moreover, whatever support for the *Cromer* definition can be found in the third *Crawford* formulation, *Cromer* is plainly at odds with the other *Crawford* formulations. The second such formulation expressly notes formality as a hallmark of "testimonial" statements: statements "contained in *formalized* testimonial materials, such as affidavits, depositions, prior testimony, or confessions" qualify as "testimonial" (emphasis added). *Crawford, supra* at 52, quoting *White* v. *Illinois*, 502 U.S. 346, 365 (1992) (Thomas, J., concurring in part and concurring in judgment). In a similar vein, the Court cited a dictionary definition of "testimony" ("[a] *solemn* declaration or affirmation made for the purpose of establishing or proving some fact"), and noted that "[a]n accuser who makes a *formal* statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not" (emphasis added). *Crawford, supra* at 51.

Justice Thomas's concurring opinion in the *White* case (in which Justice Scalia, the author of *Crawford*, joined) stressed that the confrontation clause was aimed "only" at the "discrete category" of "formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and that it should "not be construed to extend beyond the historical evil to which it was directed." *White* v. *Illinois, supra* (Thomas, J., concurring in part and concurring in judgment). The recognition of that same "formulation" in *Crawford* suggests a recognition of that same limitation — the "historical evil" addressed by the confrontation clause was the use of ex parte testimony taken by justices of the peace, and only "formalized testimonial materi-

als" that resemble, in some fashion, those justice of the peace examinations are the subject of the confrontation clause prohibition. If we are to give any weight at all to the second *Crawford* formulation, we cannot adopt *Cromer*'s all-encompassing definition of "testimonial," as it completely disregards any element of formality, solemnity, or the like.

The first *Crawford* formulation does not support *Cromer* either: "ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Crawford*, *supra* at 51. While this formulation refers to a declarant's anticipation that the statement would be "used prosecutorially," a term that would arguably encompass use of the statement prior to actual trial and perhaps as early as the mere investigative phase, its actual list of examples again consists of formalized statements — in-court testimony, affidavits, and custodial examinations. The broader reference to the statements that declarants would expect to be "used prosecutorially" is expressly linked to that prior list: "or *similar pretrial statements* that declarants would reasonably expect to be used prosecutorially" (emphasis added). *Id.* In other words, not every statement that one might expect to be "used prosecutorially" is "testimonial," but only those statements that are "similar" to in-court testimony, affidavits, or custodial examinations. Thus, the first *Crawford* formulation also has an emphasis on some degree of formality or some obvious connection with court proceedings. It does not support *Cromer*'s far-reaching definition of "testimonial."

Whereas *Cromer* ignores *Crawford*'s first two formulations and then notably expands on *Crawford*'s third formulation, we should strive for a definition that harmonizes all three formulations. The third formulation focuses on whether the declarant would reasonably appreciate a likelihood that the statement would be used "at a later trial," and the other two formulations signal that the formal, solemn, or official nature of the statement is what would ordinarily alert a reasonable person to that likelihood. See *United States* v. *Saget*, 377 F.3d 223, 228-229 (2d Cir. 2004), cert. denied, 543 U.S. 1079 (2005)

(determinative factor is "declarant's awareness or expectation that his or her statements may later be used at trial"). See also *Hammon* v. *State*, 829 N.E.2d 444, 456 (Ind. 2005) (" 'testimonial' statement is one given or taken in significant part for purposes of preserving it for potential future use in legal proceedings"). That a precise definition is elusive — so elusive that the Court declined to give one, despite the obvious adverse consequences of failing to do so[6] — does not allow us to expand on the *Crawford* formulations. The *Cromer* definition represents a significant and unwarranted extrapolation from *Crawford*, and I see no reason to stray beyond the guideposts that *Crawford* itself has provided.

The ramifications of *Cromer* also place it squarely at odds with other courts addressing statements made during emergency calls to police for help. Applying its own *Cromer* definition in a literal manner, the United States Court of Appeals for the Sixth Circuit recently pronounced that statements made during a 911 call, notwithstanding that their purpose "may have been to secure assistance," are inherently "testimonial" because they were made to "the police." *United States* v. *Arnold*, 410 F.3d 895, 903, 904 (6th Cir. 2005).[7] When addressing similar communications seeking emergency assistance, other courts have

[6]In his concurring opinion, Chief Justice Rehnquist recognized the havoc that the present uncertainty could wreak on the criminal justice system: "[T]he thousands of [F]ederal prosecutors and the tens of thousands of [S]tate prosecutors need answers as to what beyond the specific kinds of 'testimony' the Court lists . . . is covered by the new rule. They need them now, not months or years from now. Rules of criminal evidence are applied every day in courts throughout the country, and parties should not be left in the dark in this manner." *Crawford*, *supra* at 75-76 (Rehnquist, C.J., concurring).

[7]The court today states that it is not opining as to the testimonial nature of 911 calls. *Ante* at 9 n.4. That disclaimer, however, ignores the fact that the test adopted in today's opinion — "whether a reasonable person in the declarant's position would anticipate the statement being used against the accused in investigating and prosecuting a crime," *ante* at 12-13 — would, by its literal terms, sweep essentially all such calls within its ambit. That is precisely what the United States Court of Appeals for the Sixth Circuit, the source of this expanded formulation, has recently concluded. *United States* v. *Arnold*, 410 F.3d 895, 904 (6th Cir. 2005). A person seeking police assistance to deal with a medical (or other) emergency engendered by some crime would reasonably anticipate that the police would act to address that emergency and then "investigat[e] and prosecut[e]" the crime. For example, a victim dialing 911 to report that her husband just stabbed her does not expect that the police

found them not to be "testimonial" where the declarant was focused on obtaining urgently needed assistance, not contemplating the statement's potential use at a later trial. See, e.g., *Leavitt* v. *Arave*, 383 F.3d 809, 830 n.22 (9th Cir. 2004); *People* v. *Corella*, 122 Cal. App. 4th 461, 468 (2004); *State* v. *Barnes*, 854 A.2d 208, 211 (Me. 2004); *People* v. *Moscat*, 3 Misc. 3d 739, 745 (N.Y. Crim. Ct. 2004); State *vs.* Newall, Ohio Ct. App. No. 2004 CA 00265 (May 31, 2005). See also *United States* v. *Arnold*, *supra* at 914 (Sutton, J., dissenting) (most 911 calls not testimonial, as "a 911 call generally will be a plea for help, not an effort to establish a record for future prosecution").

Given the complex, fact-specific, nuanced approach taken by other courts struggling to interpret and apply *Crawford*, *Cromer*'s simplistic everything-said-to-police-is-testimonial tack appears out of step. While no one can be sure how the Supreme Court will ultimately define "testimonial," I doubt that the Court will adopt a definition that goes beyond what *Crawford* actually says and that is so far at odds with the interpretation of so many courts. There is a spectrum of opinion as to what *Crawford* means, with *Cromer* standing at one extreme end of that spectrum. I am not prepared to endorse that extreme end, but would hew closely to the formulations articulated in *Crawford* itself.

3. *Relationship between "testimonial" statements and spontaneous utterances.* With the overruling of the "reliability" test of *Ohio* v. *Roberts*, 448 U.S. 56 (1980), the *Crawford* analysis does not hinge on the rationale justifying any particular hearsay exception — we must consider whether a statement is "testimonial," not whether there is a sound basis for exempting it from the rule against hearsay. However, with regard to the specific hearsay exception of spontaneous utterances, we should not ignore the fact that the prerequisites for that exception are wholly incompatible with the features that make a statement "testimonial." To qualify as a spontaneous utterance, the statement must be made when the declarant is still under the influ-

response will be limited to sending an ambulance — a reasonable person in her position would also expect an investigation of the stabbing and prosecution of the stabber. Applying the definition announced today, the call would inescapably qualify as "testimonial."

ence of an exciting event, before having time to contrive or fabricate the statement, and it must tend to qualify, characterize and explain the exciting event. See *Commonwealth* v. *King*, 436 Mass. 252, 254-255 (2002), and cases cited. Ordinarily, these prerequisites are met by demonstrating that, in the immediate aftermath of some traumatic event, the declarant was in a highly distraught state, blurting out statements concerning that event without opportunity or capacity for reflection.

By their nature, spontaneous utterances lack the formality or solemnity that has been associated with "testimonial." They also fail the test of what the declarant would "reasonably expect" in terms of the use of the statement at a later trial. When the declarant's emotional state is such that it would satisfy the spontaneous utterance exception, the declarant does not (and reasonably would not) entertain any expectations about whether his or her statement will be used at a possible future trial — the whole premise of spontaneous utterances is that the witness is not capable of such reasoning at the time he or she is speaking.

Based on the lack of formality and the absence of any expectation on the part of the declarant that his spontaneous utterances will be used at trial, various courts have expressed the view that spontaneous utterances are not testimonial or are highly unlikely to be testimonial. See, e.g., *United States* v. *Brown*, 322 F. Supp. 2d 101, 105 n.4 (D. Mass. 2004) (in dicta, "doubtful" that *Crawford* would apply to spontaneous utterances); *Anderson* v. *State*, 111 P.3d 350, 354 (Alaska Ct. App. 2005) (finding that statement was excited utterance makes it "inconsistent" with *Crawford* formulation of "testimonial"); *State* v. *Aguilar*, 210 Ariz. 51, 53 (2005) (excited utterance not "even remotely similar to most of what *Crawford* offers as an example of a testimonial statement"); *People* v. *Corella*, *supra* at 469 ("difficult to identify any circumstances under which a . . . spontaneous utterance would be 'testimonial,' " as spontaneous utterances are "not made in contemplation of their 'testimonial' use in a future trial"); *Hammon* v. *State*, 829 N.E.2d 444, 453 (Ind. 2005) ("declarant of an excited utterance will ordinarily lack the requisite motive" to make testimonial statement); *Commonwealth* v. *Eichele*, 66 Pa. D. & C. 4th 460, 469 (2004) ("excited utterance is at the opposite

end of the hearsay spectrum from testimonial hearsay"); State *vs.* Anderson, Tenn. Crim. App. No. E2004-00694-CCA-R3-CD (Jan. 27, 2005) (essential characteristics of excited utterances "conflict with the characteristics that would make them testimonial" and "cannot be testimonial in that such a statement has not been made in contemplation of its use in a future trial").[8]

Notwithstanding that the prerequisites for admission as a spontaneous utterance are utterly disconnected from the formulations of "testimonial," there are still circumstances where a spontaneous utterance must be classified as "testimonial." For example, if the nature of the police questioning is such that it qualifies as "police interrogation," the fact that the witness is still under the sway of a recent traumatic event will not operate to take the witness's answers outside the bounds of "testimonial." See *Hammon* v. *State, supra* at 455-456; *State* v. *Hembertt,* 269 Neb. 840, 850-851 (2005). There are times where, notwithstanding a witness's emotional condition, the police attempt a systematic questioning of the witness, pressing for specifics and detail, and thereby conduct a "police interrogation," to which the witness responds with spontaneous utterances. I thus do not accept the Commonwealth's argument that all spontaneous utterances are automatically beyond the purview of *Crawford.*[9] See *Spencer* v. *State,* 162 S.W.3d 877, 881 (Tex. Ct. App. 2005) (rejecting "bright-line rule that excited

---

[8]There is already abundant post-*Crawford* precedent in support of the proposition that spontaneous utterances to persons who are unconnected with law enforcement are not "testimonial" — they cannot be the product of "police interrogation," and it is unlikely in the extreme that distraught persons making spontaneous utterances to friends, neighbors, and family members are thinking in terms of trial. See, e.g., *United States* v. *Savoca,* 335 F. Supp. 2d 385, 392-393 (S.D.N.Y. 2004); *State* v. *Aguilar,* 210 Ariz. 51, 53 (2005); *State* v. *Staten,* 610 S.E.2d 823, 831-832 (S.C. Ct. App. 2005), and cases cited.

[9]As today's opinion notes, a footnote in *Crawford* on the subject of spontaneous utterances signals, at least in dicta, that they may be "testimonial." *Ante* at 14-15, quoting *Crawford, supra* at 58 n.8. The Court's efforts in that footnote to distinguish *White* v. *Illinois,* 502 U.S. 346 (1992) (*White*), a confrontation clause case involving the admissibility of spontaneous utterances, would not have been necessary if all spontaneous utterances were, by definition, not "testimonial" under *Crawford.* However, even that *Crawford* footnote, *supra,* speaks with some caution on the subject, declining to overrule *White* and characterizing it as merely being "arguably in tension" with the holding of *Crawford. Id.*

utterances can never be testimonial," but recognizing nature of spontaneous utterance as factor to be considered in assessing whether statement "testimonial"). However, if the declarant of a spontaneous utterance is not being subjected to police interrogation, it is unlikely in the extreme that the circumstances will satisfy the more general formulations of "testimonial." It is still a separate inquiry, and the defendant is entitled to have the *Crawford* analysis conducted independently of the evidentiary analysis under the spontaneous utterance exception, but it is the rare circumstance — falling almost into the category of "never say never" — that a spontaneous utterance made outside of any "police interrogation" will qualify as "testimonial." See *United States v. Arnold*, 410 F.3d 895, 914 (6th Cir. 2005) (Sutton, J., dissenting) (number of "testimonial" statements that also qualify as spontaneous utterances "may be something approaching a null set").

Again, I agree that the present matter needs to be remanded so that that separate *Crawford* analysis can be made on a record addressing the issue, but I see nothing in the record to date to suggest that this particular declarant had any "awareness or expectation that [her] statements [would] later be used at a trial," *United States v. Saget*, 377 F.3d 223, 228 (2d Cir. 2004), cert. denied, 543 U.S. 1079 (2005), or that her purpose in making them was to preserve her testimony for use in future legal proceedings, *Hammon v. State, supra* at 457-458. Not only was her emotional state such as to qualify for the spontaneous utterance exception, but she had not summoned the police or expected their arrival, and there is nothing to indicate that she even intended to press charges at the time.

4. *Ramifications of overly broad definitions of "testimonial."* Today's decision, with its expansive interpretation of both "police interrogation" and the broader concept of "testimonial," recognizes that its approach will have a far-reaching impact on the prosecution of certain types of crimes, in particular crimes involving domestic violence. *Ante* at 14. Although domestic violence prosecutions are the most obvious category of cases in which a victim's refusal to testify often forces the prosecution to rely heavily on spontaneous utterances to police at the scene, it is not the only category of cases affected by today's decision.

Witnesses are reluctant to testify in a variety of circumstances, and may often claim a valid privilege at trial, or simply absent themselves and thereby become unavailable. Where those same witnesses have made spontaneous utterances to police at the scene, introduction of those spontaneous utterances may be essential to a successful prosecution of the case. The need to comply with *Crawford* is, of course, paramount, but any unnecessarily expansive interpretation of *Crawford* will hamper the ability of the criminal justice system to address crimes involving domestic violence or gang violence, and to prosecute crime in the face of successful witness intimidation.

While recognizing this problem, today's opinion pronounces that the criminal justice system must simply "adjust." *Ante* at 14. We must, of course, "adjust" to whatever new requirements *Crawford* has in fact laid down, but we need not impose restrictions any more onerous than what the Supreme Court intended. In the absence of any definitions in *Crawford* itself, we are caught between the Scylla of violating a defendant's confrontation rights if we interpret "testimonial" and "police interrogation" too narrowly and the Charybdis of needlessly thwarting meritorious prosecutions if we exclude evidence based on too expansive a definition of those same terms. Pending further clarification from the Supreme Court, we must attempt to steer the precise middle course between the two. Today's opinion does not strike me as that middle course, but as an overly expansive reading of *Crawford* that will unnecessarily exclude critical evidence from a significant array of cases. Courts around the country, faced with the same dilemma we are, have developed a more moderate approach in applying *Crawford's* undefined terms to the very common scenario posed by the present case. Today's decision eschews moderation, instead adopting a definition of "testimonial" that stands at the extreme edge of current jurisprudence and that goes beyond the actual language and reasoning of *Crawford*. As illustrated by the ever-increasing number of cases addressing confrontation clause issues in the wake of *Crawford*, this is not an academic debate, but an issue of tremendous pragmatic consequence to the trial of criminal cases. Given those consequences, I would not undertake any creative extrapolation from *Crawford*. I thus

concur with the result in today's opinion — a remand for development of a record that will address the confrontation clause issue in accordance with *Crawford* — but do not join in the court's assessment of what that *Crawford* analysis entails.